UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

ELIZABETH RAFFATH SILLARS,

    Plaintiff,

v.

STATE OF NEVADA, et al.,

    Defendants.

3:07-CV-00041-LRH-RAM

ORDER

Presently before the court is Defendants State of Nevada ex rel. Department of Employment Training and Rehabilitation, Employment Security Division ("ESD"), Kathy Fox, Patsy Cave, Marisol Guzman, Ruth Edsel, and Shirley Capistrant's Motion for Summary Judgment (#28[1]). Plaintiff Elizabeth Sillars has filed an opposition (#33) to which Defendants replied (#34).

**I.  Facts and Procedural History**

This is an employment discrimination dispute concerning Plaintiff's employment with Defendant ESD. For approximately seven years, Plaintiff worked for ESD in Carson City, Nevada. She began as a claims examiner and transitioned into an assistant to ESD's adjudicators. In 2003, ESD promoted Plaintiff to an adjudicator position. At that time, ESD placed Defendant Patsy Cave ("Cave") on Plaintiff's "team" to take over Plaintiff's former position as an assistant to the

---

[1] Refers to the court's docket number.

1   adjudicators. As Plaintiff trained Cave for the position, Cave and Plaintiff developed a friendship.

2   At work, Cave and Plaintiff discussed the possibility of Cave purchasing Plaintiff's home.
3   Accordingly, in early March of 2005, Cave viewed Plaintiff's house. After touring the home, Cave
4   and Plaintiff sat down to talk. During the course of their conversation, they drank one or two
5   margaritas. Cave informed Plaintiff that she "had feelings for someone in the office," and Plaintiff
6   began naming male employees to determine who the person was. Cave said that it was no one that
7   Plaintiff had named. At some point during the conversation, Cave began to cry. Plaintiff told Cave
8   that she should discuss her feelings with someone, and Cave informed Plaintiff that she had
9   discussed her feelings with Pat Stanio ("Stanio"), an adjudicator on another ESD team.

10   On March 11, 2005, Plaintiff received a text message on her cell phone from Cave asking,
11   "Are you free tonight?" Plaintiff does not recall whether she received the message before or after
12   meeting with Cave at her house. She also does not recall whether she responded to the message. In
13   addition, a few nights after visiting Plaintiff's home Cave called Plaintiff in tears stating, "I don't
14   want you to think bad of me." She asked if she could come to Plaintiff's home and talk to her, but
15   Plaintiff said, "No, it's late at night."

16   Plaintiff told her co-worker, Barbara Kelly ("Kelly"), that Cave had feelings for someone at
17   work. After someone left candy on Plaintiff's desk two or three times, and at the suggestion of
18   Plaintiff's boyfriend, Plaintiff began to speculate that Cave's romantic feelings were directed
19   toward her. Kelly told another coworker, Laura Ann Burke ("Burke") that Plaintiff believed Cave
20   had feelings for her. Burke then informed Kelly that Cave's romantic feelings were directed
21   towards a female coworker. Initially, Plaintiff and Kelly "just kind of laughed it off."

22   Sometime later, Plaintiff, Kelly, and Cave went out side for a "smoke break." Plaintiff
23   noticed that Cave kept trying to get closer to her and was looking at her breasts. On two or three
24   other occasions, when speaking with Plaintiff, Cave would stare at Plaintiff's breasts rather than at
25   her face. However, Plaintiff acknowledges that Cave often looked down when speaking to people.

26

1  In addition, Plaintiff noticed Cave "looking up and down and staring" at her.

2  Plaintiff also remembers Cave following her to the vending machine once and into the
3  restroom twice. One such instance occurred on May 10th. Cave followed Plaintiff into the
4  restroom, and instead of entering a stall, remained in the restroom until Plaintiff emerged from her
5  stall. Plaintiff states that she was afraid to come out of the stall because she was concerned that an
6  argument might ensue, possibly leading to a physical confrontation. However, when she emerged
7  from the stall, Cave did not try to approach or speak to Plaintiff.

8  In addition, Plaintiff notes that Cave, Plaintiff, and several other co-workers would send
9  funny or "chain" e-mails amongst themselves. Plaintiff never received a personal email from Cave.
10 On April 22nd, Plaintiff sent Cave an email asking her to stop forwarding and sending her messages.
11 Cave subsequently stopped sending Plaintiff emails.

12 After these instances, Plaintiff began to avoid Cave. Cave noticed this and several times
13 asked Plaintiff whether she was mad at her. Plaintiff never asked Cave if she was interested in her,
14 and Plaintiff never told Cave that she did not have feelings for her.

15 Sometime in mid-March Plaintiff went to her supervisor, Defendant Kathy Fox ("Fox") to
16 discuss the situation. She told Fox that it "just really made [her] uncomfortable, to have a female
17 that [she] considered a friend have romantic feelings toward [her]. [She] didn't know what to do
18 about it. [She] was looking for guidance." Fox then spoke with Stanio to confirm whether Cave
19 had feelings for Plaintiff. According to Sillars, Stanio confirmed that Cave had such feelings.
20 However, Stanio does not recall ever having a conversation with Cave in which Cave indicated a
21 romantic interest in a coworker. Cave also denies telling anyone in the office that she had romantic
22 feelings for Plaintiff.

23 After speaking with Stanio, Fox discussed the issue with her direct supervisor, Defendant
24 Marisol Guzman ("Guzman"). Guzman spoke with Plaintiff, asking her whether she was
25 uncomfortable at work. When Plaintiff replied that she was uncomfortable, Guzman jokingly
26

3

1  replied, "Well, why does it bother you so much?"  Plaintiff responded that she is very conservative
2  and that she felt that the idea of her being in a homosexual relationship was immoral.  Guzman then
3  said, "Well, you are a good looking woman."  Plaintiff acknowledges that Guzman said this
4  jokingly and was "trying to take the edge off."
5        Guzman then spoke with the manager of the ESD office, Defendant Shirley Capistrant
6  ("Capistrant").  Capistrant spoke with Fred Suwe, "deputy administrator north," who concluded
7  that the matter was "personal . . . [not] office related and to leave it alone."  Nonetheless, Fox asked
8  Stanio to speak with Cave and request that she "back off."  Plaintiff had hoped that Fox would give
9  her advice as to how to "go to the next level . . . maybe outside of the office."  Plaintiff states, "I
10 felt like I had become the bad guy, like everybody was mad at me for filing a complaint and for
11 reporting it."
12       In March or April of 2005, Plaintiff contacted the State of Nevada Employees Association
13 to determine how to file a sexual harassment complaint.  Sometime in May, Plaintiff met with a
14 State of Nevada Employees Association representative, Dennis Mallory ("Mallory").  Plaintiff and
15 Mallory subsequently met with Defendant Ruth Edsel ("Edsel"), the chief of human resources at
16 ESD.  Edsel told Plaintiff that ESD was going to begin an investigation into the situation.
17       Several weeks later Plaintiff met with Edsel and Cindy Jones ("Jones"), the administrator of
18 and highest-ranking person in ESD.  Jones and Edsel informed Plaintiff that they were unable to
19 substantiate Plaintiff's claims of sexual harassment.  Instead, Jones and Edsel concluded that "it
20 was simply a case of a broken friendship."
21       On April 26, 2005, Guzman and another ESD employee, Cheryl Young, met with Plaintiff
22 and told her that she was being moved to another team.  The stated reason for the transfer was that
23 three adjudicators were temporarily reassigned to a different unit, and ESD "had to do some
24 juggling of teams to even them out."  ESD selected Plaintiff and another adjudicator to move
25 teams.  Beyond the need to even the teams out, ESD specifically selected Plaintiff "because of the
26

4

1  situation that was going on and to alleviate the stress."

2  Plaintiff was unhappy with her transfer. She was uncomfortable with her new team's
3  supervisor because the supervisor was very close friends with Cave. As a result, ESD gave her a
4  new supervisor. Plaintiff also felt that ESD should have transferred Cave instead of her. However,
5  she never requested that ESD move Cave, and support staff such as Cave usually stay with the
6  same team, while adjudicators rotate between teams.

7  Plaintiff subsequently filed a complaint with the Nevada State Department of Personnel. In
8  June of 2005, the State issued a report indicating that they could not substantiate Plaintiff's
9  harassment claims. Plaintiff also filed a complaint with the Equal Employment Opportunity
10 Commission ("EEOC"). The EEOC concluded that it could not substantiate Plaintiff's claims.

11 At some point before August of 2005, Plaintiff sought medical advice from Dr. Yamamoto
12 for her work-related stress. Dr. Yamamoto suggested that Plaintiff take one week off of work,
13 which she did. In August of 2005, Plaintiff resigned from her position at ESD. She felt that her
14 reputation among her coworkers at ESD was ruined, and she "didn't want to be known as the
15 person that filed a grievance with the State."

16 Since leaving ESD, Plaintiff has continued to suffer from stress-related health problems.
17 For example, in her deposition, Plaintiff states that she has "been having a lot of problems with
18 [her] nerves and . . . start[s] shaking." In addition, she "had a lot of trouble with heartburn."
19 Plaintiff again visited Dr. Yamamoto, and he proscribed her medication for her nerves and advised
20 her to take over-the-counter medication for her heartburn.

21 **II.   Legal Standard**

22 Summary judgment is appropriate only when "the pleadings, depositions, answers to
23 interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
24 genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of
25 law." Fed. R. Civ. P. 56(c). In assessing a motion for summary judgment, the evidence, together

26

5

1  with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable
2  to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,
3  587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

4  　　　　The moving party bears the burden of informing the court of the basis for its motion, along
5  with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*,
6  477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party
7  must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could
8  find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.
9  1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

10 　　　　In order to successfully rebut a motion for summary judgment, the non-moving party must
11 point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v.*
12 *Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might
13 affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
14 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary
15 judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute
16 regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could
17 return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a
18 scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine
19 dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at
20 252.

21 **III.   Discussion**

22 　　　　**A.  Gender Discrimination**

23 　　　　Plaintiff's first claim for relief alleges that Defendant ESD "engaged in intentional
24 discrimination against Plaintiff based upon her gender." (Compl. (#1) ¶ 13.) The parties interpret
25 this claim differently. In their motion for summary judgment, Defendants treat this claim as

26

6

alleging a claim of hostile work environment sexual harassment. In her opposition, Plaintiff interprets the claim as alleging a claim of disparate treatment discrimination based on Plaintiff's gender. The court will review each of these theories below.

### 1. Hostile Work Environment Sexual Harassment

Section 2000e–2(a)(1) of Title VII makes it an unlawful employment practice "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Sexual harassment is a species of gender discrimination and thus constitutes a violation of Section 2000e-2. *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000). A claim for sexual harassment under Title VII can fall under one of two theories: quid pro quo or hostile working environment. *Id*. To survive summary judgment on a claim based on a hostile work environment, "a plaintiff must show that: (1) she was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment." *Porter v. California Dep't of Corr.*, 419 F.3d 885, 892 (9th Cir. 2005) (*citing Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2004)).

To determine whether conduct was sufficiently severe or pervasive to violate Title VII, the court considers "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)). "The working environment must both subjectively and objectively be perceived as abusive." *Fuller v. City of Oakland, California*, 47 F.3d 1522, 1527 (9th Cir. 1995) (*citing Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)). To determine if the workplace is objectively hostile, courts examine the issue from the perspective of a reasonable person with the same fundamental characteristics as the claimant. *Id.* Thus, "[t]o shield employers

7

from having to accommodate the idiosyncratic concerns of the rare hyper-sensitive employee . . . a female plaintiff states a prima facie case of hostile environment sexual harassment when she alleges conduct which a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1992) (citations omitted).

Here, Plaintiff has failed to meet the first element of a prima facie case because there is no evidence that Plaintiff was subjected to verbal or physical conduct of a sexual nature.  In *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80, the Court described three ways by which a plaintiff alleging same-sex harassment can establish that she was subjected to conduct of a sexual nature. First, the plaintiff can present "credible evidence that the harasser was homosexual." *Id.*  Second, the plaintiff can show that she was "harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." *Id.*  Finally, the same-sex harassment plaintiff can "offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Id.* at 80-81.

Under any of the above-three methods, Plaintiff has failed to establish that she was subjected to verbal or physical conduct of a sexual nature.  Beyond Plaintiff's allegations that Cave was interested in a romantic relationship with her, there is no evidence demonstrating that Cave is homosexual.  Instead, Cave is married and has several children.  There is no evidence that she has ever been in, or intends to be in, a homosexual relationship, and Cave denies having romantic feelings for Plaintiff.

Further, Cave did not harass plaintiff in "sex-specific and derogatory terms." *Oncale*, 523 U.S. at 80.  Plaintiff's evidence establishes that Cave left candy on her desk, sent her chain emails,

8

1 looked at her,[2] stood close to her, and followed her down the hall once, to the printer once, and to
2 the bathroom twice.  By her own admission Plaintiff does not recall Cave ever making any sexually
3 suggestive remarks or comments to her.  (Mot. for Summ. J. (# 33), Ex. 1, 147:4-8.)  Even when
4 viewed in the light most favorable to Plaintiff, Plaintiff has failed to establish that Cave subjected
5 her to comments or conduct of a sexual nature.

6        Plaintiff has also failed to establish that, when viewed objectively and subjectively, the
7 working environment was sufficiently severe or pervasive to alter her conditions of employment.
8 In addition to the above-cited conduct by Cave, in her opposition Plaintiff alleges that, by August
9 of 2005, she had become the "brunt of office jokes."  (Opp'n to Mot. for Summ. J. (# 33) at 5.)
10 However, this statement is not supported by the evidence.[3]  As additional evidence of the severity
11 and pervasiveness of the harassment, Plaintiff points to the confrontation during which Guzman,
12 one of Plaintiff's supervisors, asked Plaintiff, "why does it bother you so much" and said that
13 "[Plaintiff] was a good looking woman."  However, in her deposition Plaintiff notes that Guzman
14 made the comments jokingly and was "trying to take the edge off."  Thus, subjectively, Plaintiff did
15 not find the comments offensive.  The court also finds that no reasonable woman would find the
16 above-described conduct sufficiently sever and pervasive to alter the conditions of Plaintiff's
17 employment.

18        To establish a hostile work environment sexual harassment claim Plaintiff must show that

---

[2] Much of Plaintiff's claim appears to be based on Cave's staring and "leer[ing] at her breasts."  (Mot. for Summ. J. (# 33), Ex. 1, 135:5-7.)  However Cave denies staring or leering, and no witness corroborates Plaintiff's testimony.  The one instances that Plaintiff specifically cites in her opposition occurred when Cave talked to Plaintiff in her cubicle.  *Id.* at 103:23-25.  Cave was standing and Plaintiff was sitting down at her desk.  Thus, Cave necessarily had to look down at Plaintiff to speak with her.  This evidence is insufficient to establish that Cave looked at Plaintiff in a sexual way.

[3] In support of this statement Plaintiff cites to "Exhibit 4 to Dickerson Declaration at NEV132, Witness 5; NEV138."  However, NEV132 and NEV138 are not included in Plaintiff's Exhibit 4.  Moreover, Witness 5 merely states that Plaintiff was worried about rumors and people thinking that she was a lesbian.  Plaintiff also cites to her deposition at 141:24-142:22.  However, there, Plaintiff merely states that she was worried about her reputation.

9

she was subjected to sexual conduct that, when viewed both subjectively and objectively, was so severe and pervasive as to alter the conditions of employment. Plaintiff has failed to provide evidence indicating that she was subjected to conduct of a sexual nature or that the working environment was subjectively or objectively hostile or abusive. Because these are essential elements of Plaintiff's hostile work environment sexual harassment claim, and elements for which Plaintiff bears the burden of proof, summary judgment in favor of Defendants is appropriate.

### 2.     Disparate Treatment Discrimination

Plaintiff argues that she suffered disparate treatment discrimination because of her gender. To establish a prima facie case of disparate treatment discrimination, Plaintiff must show that (1) she belongs to a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) similarly situated individuals outside of her protected class were treated more favorable. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (*citing Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1126 (9th Cir. 2000)). If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the defendant provides such a justification, the burden shifts back to the plaintiff to show that the defendant's justification is a mere pretext for discrimination. *Id.* at 804.

Defendants do not dispute that Plaintiff, as a woman, is a member of a protected class or that Plaintiff was performing her job satisfactorily. Therefore, Plaintiff has made a sufficient showing as to the first two elements of a prima facie disparate treatment discrimination claim.

With regard to the third element, "[f]or purposes of a disparate treatment claim, an adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment." *Davis*, 520 F.3d at 1089. "[H]iring, firing, failing to promote, reassignment with significantly differently responsibilities, or a decision causing a significant change in benefits" are

10

adverse employment actions. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (citations omitted).

Plaintiff alleges that she suffered an adverse employment action in two ways. First, she argues that her transfer was an adverse employment action. "Reassignment with significantly differently responsibilities" constitutes an adverse employment action. *Ellerth*, 524 U.S. at 761. While Defendants do not dispute that ESD transferred Plaintiff, Defendants maintain that the transfer was not adverse. Defendants note that after the transfer, Plaintiff's job classification and title remained the same, she received the same pay, her duties remained the same, and she was merely rotated to a different team in the same room. Further, Plaintiff recognizes that rotating arbitrators was a common practice at ESD. These facts do not indicate that Plaintiff suffered a reassignment resulting in "significantly different responsibilities." Thus, no genuine issues of material fact remain concerning whether Plaintiff's transfer was adverse, and Plaintiff cannot defeat summary judgment on this basis.

Second, Plaintiff argues that she suffered an adverse employment action in that she was constructively discharged. To establish a constructive discharge, Plaintiff must show that "working conditions [became] so intolerable that a reasonable person in the [her] position would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 142 (2004) (citation omitted). Because Plaintiff has failed to establish that she was subjected to a hostile work environment, it follows that she has not made the further showing that the "abusive working environment became so intolerable that her resignation qualified as a fitting response." *Id.* at 133. As a result, Plaintiff cannot defeat summary judgment on this basis.

Under either a reassignment or a constructive discharge theory, Plaintiff has failed to establish that she suffered an adverse employment action. In addition, Plaintiff has failed to meet the fourth element of a prima facie case by showing that similarly situated individuals outside of her protected class were treated more favorably than she was. In fact, Plaintiff has not alleged and

has presented no evidence indicating that ESD treated similarly situated individuals outside of her protected class more favorably.  Accordingly, because Plaintiff has failed to establish essential elements of her disparate treatment gender discrimination claim, and because she bears the burden of demonstrating those elements, summary judgment in favor of Defendant's on the gender discrimination claim is appropriate.

### B. Retaliation

Plaintiff asserts claims for retaliation under Title VII and 42 U.S.C. § 1982.  The court will address each of these claims below.

#### 1. Retaliation under 42 U.S.C. § 2000e-3(a)

Plaintiff's second claim for relief alleges that ESD intentionally retaliated against her in violation of 42 U.S.C. § 2000e-3(a).  Under section 2000e-3(a), it is unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII ], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, a plaintiff must demonstrate that "(1) she engaged in an activity protected under title VII; (2) her employer subjected her to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Thomas v. City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004) (*citing Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000)).  If a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for its decision.  *Ray*, 217 F.3d at 1240.  If the defendant demonstrates such a reason, the burden shifts back to the plaintiff to show that the defendant's reason was a mere pretext for discrimination.  *Id.*

Defendants do not dispute that Plaintiff's internal complaint qualifies as a protected activity. *See Ray*, 217 F.3d at 1240 n.3 (noting that making an informal complaint to a supervisor is a

protected activity). However, the parties dispute whether Plaintiff suffered an adverse employment action. In the retaliation context, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, meaning that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (citations omitted). While a prima facie case of Title VII's substantive provision (anti-discrimination) and a prima facie case of retaliation both require an adverse employment action, the two terms are not coterminous. *Id.* at 67. Instead, "the scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Id.* Thus, under *White*, the court must conduct a separate and different analysis to determine whether the plaintiff suffered an adverse employment action to support a Title VII retaliation claim.

Plaintiff argues that she suffered an adverse employment action in several ways. She first argues that her "involuntary transfer" was reasonably likely to deter protected activity, and thereby qualifies as an adverse employment action. Lateral transfers and reassignment of job duties may constitute actionable adverse employment actions. *Ray*, 217 F.3d at 1243; *see also White*, 548 U.S. at 71 (holding that a reassignment to a position with more arduous duties and fewer qualifications was an adverse employment action). Indeed, the Ninth Circuit has held that "a transfer to another job of the same pay and status may constitute an adverse employment action." *Ray*, 217 F.3d at 1241 *(citing St. John v. Employment Dept.*, 642 F.2d 273, 274 (9th Cir. 1981)). For example, in *St. John*, the plaintiff was transferred from one position to another position. *Id.* The court found this transfer adverse even though the new position provided the same pay and status. *Id.* Similarly, in *Yartzoff v. Thomas*, the court found that the employer's transfer of job responsibilities away from the plaintiff constituted an adverse employment action. 809 F.2d 1371, 1375-76 (9th Cir. 1987).

Nonetheless, the above-cited cases base their findings of adverse employment actions on more than mere lateral transfers to identical positions. For example, in *St. John,* the employer

transferred the plaintiff to a different job, with new duties. 642 F.2d at 274. In *Yartzoff*, the employer transferred job duties away from the plaintiff. 809 F.2d at 1375. In *Foraker v. Apollo Group*, the court found an adverse employment action where the employer "reorganized" plaintiff, resulting in the loss of job responsibilities, the revocation of his title, and the denial of his promised salary increase. 427 F. Supp. 2d 936, 942 (D. Ariz. 2006).

Here, unlike the above-cited cases, Plaintiff suffered no additional detriment beyond her transfer to a new team. Plaintiff's new position involved the same job responsibilities, status, working hours, level of pay, and job title. The only change was the personnel makeup of her new team. Plaintiff provides no evidence demonstrating how her new position was different from her former position. Further, Plaintiff does not appear to allege that her new position was different from her former position. Because Plaintiff's new position was virtually identical to her previous position, the court finds that no reasonable person would conclude that the reassignment was materially adverse to Plaintiff's employment. As a result, Plaintiff cannot defeat summary judgment on this basis.

Plaintiff also argues that she suffered an adverse employment action because her coworkers and supervisors ostracized her. Noting that mere ostracism by co-workers is not an adverse action, *Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000), Plaintiff argues that "the Circuit has not ruled out the concept that ostracism by supervisors who can control such behavior would be reasonably likely to deter subordinate's speech." (Opp'n to Mot. for Summ. J. (# 33) at 8.) The instances of potential supervisory retaliation alleged by Plaintiff are that (1) Guzman did not socialize with her as much as she used to; (2) Fox once uncharacteristically referred to Plaintiff as "Elizabeth" rather than "Liz"; and (3) Fox once made her use leave for being three minutes late for work. Ex. 1, 147:21-22; 149:17-22. The court finds that no reasonable person in Plaintiff's position would find these three isolated incidents materially adverse to her employment. Thus, Plaintiff cannot defeat summary judgment on this basis.

Finally, Plaintiff argues that she suffered an adverse employment action in that she was constructively discharged. If established, a constructive discharge is an adverse employment action. *Jordan v. Clark*, 847 F.2d 1368, 1377 n.10 (9th Cir. 1988). However, as noted above, the court finds that Plaintiff has not shown an environment so severely and pervasively hostile as to cause her constructive discharge. As a result, Plaintiff cannot defeat summary judgment on this basis.

Plaintiff has failed to show that she endured an adverse employment action. Because this is an essential element of Plaintiff's Title VII retaliation claim and one for which Plaintiff bears the burden of proof, summary judgment in favor of Defendants is appropriate.

### 2. Retaliation under 42 U.S.C. § 1983

Plaintiff's fourth claim for relief alleges that the individual defendants, Fox, Cave, Guzman, Edsel, and Capistrant, violated Plaintiff's First Amendment right to free speech by retaliating against her for complaining about the alleged gender-based discrimination in violation of 42 U.S.C. § 1983. To establish a retaliation claim pursuant to § 1983, a plaintiff must show that: (1) she engaged in a protected activity; (2) her employer took an adverse employment action; and (3) her conduct was a substantial or motivating factor for the adverse employment action. *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003). As discussed above, Defendants have met their initial burden of demonstrating that there is no evidence that Plaintiff suffered an adverse employment action, an essential element of Plaintiff's claim. Consequently, no genuine issues of material fact remain concerning Plaintiff's § 1983 retaliation claim, and summary judgment is appropriate.

### C. Equal Protection

Plaintiff's third claim for relief alleges that the individual defendants, Fox, Cave, Guzman, Edsel, and Capistrant, denied Plaintiff's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution on the basis of her gender. A government official

15

who performs discretionary functions is entitled to qualified immunity from liability for civil damages "insofar as [her] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130,1134 (9th Cir. 2003) (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The initial inquiry is whether Defendants violated Plaintiff's constitutional rights. *Id.* "To establish a § 1983 Equal Protection violation, a plaintiff must show that the defendant, acting under color of state law, discriminated against her as a member of an identifiable class and that the discrimination was intentional." *Id.* (citations omitted). For equal protection purposes, plaintiff is a member of a protected class because she alleges discrimination on the basis of her gender. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 322 (1991) ("women are unquestionably a protected class").

The factual basis for Plaintiff's equal protection claim is not clear. In her complaint, Plaintiff states, "Cave intended to and did treat Plaintiff differently than others similarly situated while acting under color of State law upon her gender and sex." (Compl. (#1) ¶ 6.). In addition, Plaintiff alleges that the other individual defendants, Fox, Guzman, Edsel, and Capistrant, "failed to promptly investigate and failed to reasonably and promptly remedy Cave's sexual advances." (Compl. (#1) ¶ 7.). Similarly, in her Opposition, Plaintiff appears to argue that her supervisors' participation in and failure to remedy the alleged harassment subjects them to liability under § 1983. (Opp'n to Mot. for Summ. J. (# 33) at 9.) Defendants respond that Plaintiff "cannot point to any instances where she experienced unequal treatment based on gender," (Mot. for Summ. J. (# 28) at 17) and that Plaintiff "completely fails to allege personal behavior of the Defendants that was discriminatory and an intentional response to her complaints." (Reply to Pl.'s Opp'n to Mot. for Summ. J. (# 33) at 9.)

Defendants note that "Plaintiff cannot point to any instance where she experienced unequal treatment based on gender." (Mot. for Summ. J. (# 28) at 17.) Indeed, there is no evidence

indicating that Defendants treated Plaintiff's complaints of sexual harassment differently from other types of harassment. As a result, Defendants have met their burden of demonstrating that there is no genuine issue of material fact as to whether Defendants violated Plaintiff's constitutional rights. Thus, Plaintiff's § 1983 claim fails as a matter of law, and summary judgment is appropriate.

### IV.     Conclusion

Defendants have shown that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law on Plaintiff's gender discrimination, Title VII retaliation, § 1983 retaliation, and equal protection claims. Summary judgment for Defendants is therefore granted.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (#28) is GRANTED.

The Court Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

DATED this 6th day of October, 2008.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

17